# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN MARK WEINSTEIN, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-14-1079 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

State inmate Steven Mark Weinstein, represented by counsel, filed a section 2254 habeas petition challenging his conviction and thirty-year sentence for murder. Respondent filed a motion for summary judgment (Docket Entry No. 18), to which petitioner filed a response (Docket Entry No. 19).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this case for the reasons that follow.

### *Procedural Background and Claims*

Petitioner was convicted of murder in Harris County, Texas, and sentenced to thirty years' incarceration on December 16, 2008. The conviction was affirmed on direct appeal, and the Texas Court of Criminal Appeals refused discretionary review. *Weinstein v. State*, No. 14-08-01149-CR, 2010 WL 2967675 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (mem. op., not designated for publication).

Petitioner's application for state habeas relief, filed with the state trial court on February 22, 2012, was denied by the Texas Court of Criminal Appeals in a published opinion on January 29, 2014. *Ex parte Weinstein*, 421 S.W.3d 656 (Tex. Crim. App. 2014).

Petitioner raises the following claims for relief in the instant petition:

1.  The State's witness falsely testified that he never experienced delusions or hallucinations.

2.  Trial counsel was ineffective in failing to:

    a.   obtain and present evidence of the witness's mental health issues; and

    b.   request a jury instruction on manslaughter.

Respondent argues that these claims are without merit and should be dismissed.

### *Factual Background*

The Texas Court of Criminal Appeals set forth the following statement of facts in its published opinion denying habeas relief:

> Applicant was convicted of murdering Jerry Glaspie.  He filed a post conviction application for a writ of habeas corpus, alleging that he was denied due process because (1) the State failed to disclose that its key witness, Nathan Adams, had hallucinations and delusions, and (2) the State presented false testimony when Mr. Adams lied about not having hallucinations and delusions. The habeas judge initially filed findings of fact and conclusions of law recommending that we deny relief, but we remanded the case and asked her to determine (1) whether Nathan Adam's testimony was false, and, if so, (2) whether applicant had shown a reasonable likelihood that the false testimony affected the judgment of the jury.  In revised findings, the judge found that the State unknowingly presented false testimony when Nathan Adams testified that he did not suffer from auditory or visual hallucinations.  The judge also found that Mr. Adams was a key witness in establishing applicant's intent to

murder. She concluded that there was a reasonable likelihood that the outcome of the trial would have been different had Mr. Adams admitted to having hallucinations.

We adopt the habeas judge's factual findings that Adams's testimony about his lack of delusions was false, but we conclude that applicant has failed to prove that Adams's false testimony was 'material,' *i.e.*, reasonably likely to have affected the jury's verdict.

The evidence at trial showed that, in mid–2006, applicant and Jerry Glaspie drove from Houston to Dallas planning to use applicant's $14,000 to buy methamphetamine. The drug deal did not go as planned. Although Jerry instructed applicant to bring cash, applicant tried to buy the meth with a $14,000 cashier's check. '[T]he banks were closed because it was the weekend and so there was no place to cash the check.' Unwilling to wait for the banks to open, applicant left Jerry in Dallas with his check, expecting him to return to Houston with either meth or money.

Jerry remained in Dallas, so applicant called him 'four or five times a day,' but Jerry 'stopped answering the phone.' Then applicant started calling Jerry's friends in Houston. Around November, applicant contacted Jerry's friends on Manhunt [a dating website with 'a lot of' known recreational drug users], explaining how Jerry ripped him off and looking for ways to find him. Applicant 'was very upset and angry.' He tried to get a mutual friend to call Jerry and tell him that someone in Houston wanted to make a major methamphetamine buy. Applicant planned to 'surprise' Jerry when he appeared and demand his money back. When asked what he would do if Jerry didn't have his money, applicant said, 'Oh, well, we'll just scare him.'

Applicant's plans grew more violent. At one point, he suggested driving to Dallas and 'tak[ing] him for a ride somewhere.' If Jerry didn't have his money, applicant said that 'maybe we can hurt him. We can do something, just do stuff just to scare him, just to get him to, you know, cough up the money.' In another plot, applicant asked his interior decorator to help bring Jerry back 'with or without [his] consent' by 'giving him some drug or maybe using a taser gun.' Applicant also talked about using restraints: '[H]e was [going] to have to tie him up . . . and then put him in the car and bring him to Houston.'

Jerry eventually returned to Houston without the drugs or applicant's $14,000. Although he was warned to stay away from applicant, Jerry told his friends that he had 'made arrangements to pay him off in installments,' so '[d]on't worry about it.'

On the morning of January 29, 2007, Jerry borrowed his roommate's 4–Runner to visit some people, including applicant. Jerry never returned. Worried about Jerry's disappearance, his roommate filed a missing persons report. A few weeks later, police found the 4–Runner in a church parking lot. Although Jerry's friends feared that he was at applicant's house, no one called the police because they didn't want cops 'poking around' in their drug business.

Near the end of February, residents in applicant's townhouse complex noticed an odor coming from applicant's garage. It was so strong that the mailman refused to deliver the mail. When his neighbors repeatedly asked about the smell, applicant said that his ex-roommate had hidden food all over the house, but he was trying to clean up all the rotting food.

On March 8th, HPD Officer Ladewig was dispatched to applicant's house to check out the foul odor coming from the garage. She noticed 'this awful, horrible smell' and 'a big swarm of flies' coming in and out of applicant's garage. Although she recognized the smell of a dead body, she was not '100 percent sure' that it was anything more than a dead animal, so she did not try to contact applicant. Two days later, she was again dispatched to applicant's home. Convinced that she was smelling a dead body, she asked her supervisor to join her, and together they knocked on applicant's door and used their loudspeaker, but applicant did not respond. Although they wanted to make a forced entry, the D.A.'s Office told them that they could not enter without a search warrant.

At 5:00 a.m. on March 22nd, Officer Ladewig was on patrol near applicant's house. Still convinced that the odor coming from applicant's garage was from a dead body, she drove her partner to the house to get his opinion. When they arrived, applicant was standing in his front yard. He told the officers that his ex-roommate 'had left rotting meat and trash all over' the house and garage. While telling his story, applicant 'was stuttering' and 'appeared very upset,' and 'nervous.' When Officer Ladewig asked to see inside the garage, applicant refused because 'he was too tired.'

The next afternoon, a different officer was called to follow up on another odor complaint at applicant's house.  He 'immediately identified that smell as that of a dead body.'  He also smelled 'the strong odor of a cleaning agent, like bleach,' indicating that somebody 'was trying to clean up after what they did.'  That officer opened applicant's garbage can and saw several empty bottles of bleach and other cleaning fluids.  He couldn't contact applicant, but finally officers called for a cadaver dog who 'alert[ed]' at applicant's garage, indicating that there were human remains in the garage.  After obtaining a search warrant, the officers cut through applicant's gate and entered his unlocked house.

They discovered applicant lying on a bed upstairs.  He 'appeared to be shaking, like he was having a seizure.'  A police scanner was on the bed next to him.  He was taken away while officers entered the garage and found applicant's car.  As an officer went to the trunk of the car, he saw a bent coat hanger securing the trunk lid shut.  He opened the trunk and found a naked, 'badly decomposed,' body.  An engine hoist was nearby.  When they searched the rest of the house, the officers found an empty oil drum in the kitchen; two semiautomatic guns near the headboard of applicant's bed; a respirator on the bedroom floor; and baking soda, cleaning supplies, bug killers, and deodorizers near the entrance to the garage.

Dental and fingerprint evidence confirmed that the body was that of Jerry Glaspie.  Jerry had no clothes on.  His wrists and legs were bound together with metal shackles, rope, chains, and wire.  There were 'loops of duct tape' around his lower neck that had 'probably slipped off from his lower face.'  The Medical Examiner (M.E.) determined that Jerry's death was a homicide, although he could not say with 100% certainty that Jerry did not die of natural causes.  The bones in Jerry's neck had begun to disarticulate, but the M.E. could not determine if this was caused by strangulation or natural decomposition.  While the exact cause of death could not be determined, the M.E. said that Jerry's death could have been caused either by strangulation or by asphyxiation from the duct tape.

Nathan Adams testified that he met applicant in a tank for jail detainees with a medical illness.  Applicant began talking about his case and that jogged Adams's memory about a television story he had seen reporting that a dead body had been found in a car trunk after the neighbors had complained about the smell.  Adams testified that he did not read any additional news coverage, nor had he obtained any information about the crime from another source.

5

Adams testified that applicant told him that Jerry stole $14,000 from him when he went to Dallas to buy a 'car.'  [Another witness testified that 'automobile' was a code word for crystal meth.]  Applicant told Adams conflicting stories about how Jerry died, but his second story was 'that he had strangled the gentleman and had placed him in the trunk.'  Adams testified that applicant demonstrated 'on [him] . . . the way he did it:'

> [H]e rapped a towel a certain way and he asked me to stand up, which I did, and he came behind me and put the towel in a certain way around my neck and immediately when he pulled it, it was extremely painful.  And I knew that if that was applied to anybody that they would be in serious trouble immediately.

Adams explained that applicant was a massage therapist and claimed to have 'specialized knowledge of pressure points, pressure points in the body whether it was . . . to help somebody or to hurt somebody.'  Applicant told Adams that he put Jerry's body in the trunk of his car but the smell became horrible, so he bought dry ice and sprayed insecticides to keep the smell down.  He was scared because the smell was so bad that he 'stayed in his house and never left his house again until the police came.'

Adams testified that applicant explained why he didn't move the body.  'He had a problem because he couldn't get the trunk open . . . I guess the body had swelled so much that he could no longer open the trunk . . . . [S]o he went to a . . . store, to buy an engine hoist to try and pry it open.'  Applicant went into detail about the engine hoist, explaining how he had to go to the store multiple times because it was missing instructions and necessary parts.

On cross-examination, the defense extensively impeached Adams's credibility. He had been in-and-out of jail since the mid 1990s.  In addition, Adams admitted that he was testifying in exchange for a reduced charge from assault on peace officer, a third-degree felony, to simple assault with credit for time served.  In fact, it was Adams who initially contacted the District Attorney, writing several letters offering to testify against applicant in exchange for a deal.  He also admitted to having seen the indictment – one that charged applicant with 'suffocating' Jerry Glaspie – while in jail.  Adams admitted that he was again in custody because he failed to appear to testify and was brought to the courtroom in handcuffs.

Furthermore, Adams admitted that he suffered from bipolar disorder, for which he takes Depakote and Seroquel.  But when he was asked whether his mental illness 'has ever caused you to have any type of audi[tory] or visual hallucinations,' Adams responded: 'Not at all.  No, sir, not at all.'  And when asked if he ever experiences false memories, Mr. Adams responded in the negative.  Finally, when asked if his bipolar disorder only affected his mood, Mr. Adams responded:  'Yes, sir, it's just—it's just mood swings is what it is.'

In closing arguments, the defense argued that applicant did not intend to kill Jerry.  Counsel claimed that the State failed to prove what happened on the day Jerry died because the Medical Examiner could not completely rule out a natural cause of death.  Thus, it was possible that applicant put Jerry in the trunk just to scare him, without any intent to kill him.  The defense also attacked Adams's testimony, arguing that Adams was the only witness supporting the indictment's theory that Jerry was strangled, but that Adams was not a credible witness because he had an extensive criminal record and had every reason to lie.

The State's closing focused on applicant's motive for killing Jerry and the comments he made to his friends while Jerry was still in Dallas.  The prosecutor tallied up the evidence showing that Jerry was tied up, alive and struggling.  And, the prosecutor argued, it did not matter exactly how Jerry died: 'Was he standing?  Was he sitting?  I don't know and I don't have to prove that to you.  Because the bottom line is the evidence is consistent with everything Nathan Adams told you.'  The prosecutor then turned to Adams's testimony, admitting that Adams was not 'altruistic' and that he had 'an agenda' in testifying.  But 'he knew things that there's only one way he could know about.'  The prosecutor pointed out that

> [t]here wasn't anything in the news about 14 grand and a death. It was a body found in the trunk.  You didn't hear any testimony that there was ever anything released about how the body was killed.  There was nothing.  But here comes Mr. Adams and suddenly he knows things that there's no way else he could know unless he got it from the horse's mouth.

He pointed to additional information that Adams could have known only from applicant:  He knew about the use of dry ice and insecticide to cover the smell of the body and he knew about the engine hoist in applicant's garage.  The prosecutor argued that Adams demonstrated his credibility: 'He told you

everything [applicant] had told him. He didn't embellish. He didn't say this was over drugs . . . . If he was making up his testimony, don't you think he would have fitted it a little bit better?'

The jury convicted applicant of murder and sentenced him to thirty years' imprisonment and a $10,000 fine. Applicant challenged the sufficiency of the evidence on appeal, but the Fourteenth Court of Appeals affirmed his conviction.

After we remanded applicant's habeas application to the convicting court, the habeas judge made 'revised' findings of fact and conclusions of law. She found that Adams testified falsely in 'denying that he had any audi[tory] or visual hallucinations and did not remember things that didn't really happen.' She listed numerous reports that said Adams suffered from delusions and hallucinations. Although the judge found that neither the State nor the defense were aware that Adams's testimony was false, she found that '[t]he State created the false impression that Adams was bipolar but never had any type of hallucinations.'

On the question of materiality, the trial judge concluded that 'Adams was the key prosecution witness, as he was the only person who testified that applicant admitted causing Glaspie's death. The State used Adams's testimony to establish that applicant intentionally killed Glaspie.' While noting that defense counsel 'elicited on cross-examination that Adams received psychiatric care and medication in jail,' the judge concluded that '[t]he impeachment information contained in Adams's medical records was more important than other 'impeachment' evidence presented at trial.' She recommended granting relief because '[t]here is a reasonable probability that the outcome of the trial would have been different had applicant impeached Adams's false testimony that he did not have hallucinations.'

*Ex parte Weinstein*, 421 S.W.3d at 659–664 (footnotes omitted). As stated earlier, the Texas

Court of Criminal Appeals declined to adopt the trial court's finding that the testimony was

"material," and held instead that the testimony was not material.

8

### *The Applicable Legal Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U .S.C. § 2254. Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id*. at 411. "It bears repeating that even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." *Richter*, 562 U.S. at 102.  As stated by the Supreme Court

in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be.  As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on
> federal court relitigation of claims already rejected in state proceedings.  It
> preserves authority to issue the writ in cases where there is no possibility
> fairminded jurists could disagree that the state court's decision conflicts with
> this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view
> that habeas corpus is a 'guard against extreme malfunctions in the state
> criminal justice systems,' not a substitute for ordinary error correction through
> appeal.

*Id.*, at 102–03 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues.  Under

28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a

factual determination will not be overturned on factual grounds unless it is objectively

unreasonable in light of the evidence presented in the state court proceeding.  *Miller–El v.

Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying

factual determination of the state court to be correct, unless the petitioner rebuts the

presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see

also Miller–El*, 537 U.S. at 330–31.

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether

the pleadings, discovery materials, and the summary judgment evidence show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law.  FED. R. CIV. P. 56(c).  Once the movant presents a properly supported

motion for summary judgment, the burden shifts to the nonmovant to show with significant

probative evidence the existence of a genuine issue of material fact.  *Hamilton v. Segue*

*Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding,

the rules only apply to the extent that they do not conflict with the federal rules governing

habeas proceedings.  Therefore, section 2254(e)(1), which mandates that a state court's

findings are to be presumed correct, overrides the summary judgment rule that all disputed

facts must be construed in the light most favorable to the nonmovant.  Accordingly, unless

a petitioner can rebut the presumption of correctness of a state court's factual findings by

clear and convincing evidence, the state court's findings must be accepted as correct by the

federal habeas court.  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on*

*other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### False Testimony

Petitioner claims that the State's witness, Nathan Adams, falsely testified that he did

not suffer from delusions and hallucinations.  He further claims that the State was aware of

the falsity of the testimony, and that the false testimony was material.  In short, petitioner

asserts a claim for relief under *Giglio v. United States*, 405 U.S. 150 (1972).

In rejecting petitioner's arguments on state collateral review, the Texas Court of

Criminal Appeals held as follows:

11

After we remanded applicant's habeas application to the convicting court, the habeas judge made 'revised' findings of fact and conclusions of law.  She found that Adams testified falsely in 'denying that he had any audi[tory] or visual hallucinations and did not remember things that didn't really happen.'  She listed numerous reports that said Adams suffered from delusions and hallucinations.  Although the judge found that neither the State nor the defense were aware that Adams's testimony was false, she found that '[t]he State created the false impression that Adams was bipolar but never had any type of hallucinations.'

On the question of materiality, the trial judge concluded that 'Adams was the key prosecution witness, as he was the only person who testified that applicant admitted causing Glaspie's death.  The State used Adams's testimony to establish that applicant intentionally killed Glaspie.'  While noting that defense counsel 'elicited on cross-examination that Adams received psychiatric care and medication in jail,' the judge concluded that '[t]he impeachment information contained in Adams's medical records was more important than other 'impeachment' evidence presented at trial.'  She recommended granting relief because '[t]here is a reasonable probability that the outcome of the trial would have been different had applicant impeached Adams's false testimony that he did not have hallucinations.'

*Ex parte Weinstein*, 421 S.W.3d at 659–664 (footnotes omitted).  The state court further held

that:

In revised findings, the judge found that the State unknowingly presented false testimony when Nathan Adams testified that he did not suffer from auditory or visual hallucinations.  The judge also found that Mr. Adams was a key witness in establishing applicant's intent to murder.  She concluded that there was a reasonable likelihood that the outcome of the trial would have been different had Mr. Adams admitted to having hallucinations.

We adopt the habeas judge's factual findings that Adams's testimony about his lack of delusions was false, but we conclude that applicant has failed to prove that Adams's false testimony was 'material,' *i.e.*, reasonably likely to have affected the jury's verdict.

*Id.*, at 659.

A state denies a criminal defendant federal due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio*, 405 U.S. at 154; *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). To obtain relief, the defendant must show that (1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). Neither party in the instant proceeding contests the correctness of the state court's finding that Adams's testimony was false. Petitioner, however, disputes the state court's findings that the false testimony was not material and that the State did not know that the testimony was false at the time.

Both parties acknowledge that the State's *unknowing* use of false testimony is actionable under state law, but that it does not, under current Supreme Court law, give rise to a federal constitutional violation. *See Kinsel v. Cain*, 647 F.3d 265, 271–72 (5th Cir. 2011) (affirming the denial of federal habeas relief because the Supreme Court has not recognized a constitutional violation for the unknowing use of false testimony). Petitioner asserts that, although the State did not knowingly use the false testimony, the State nevertheless had *constructive* knowledge of the falsity of Adams's testimony because the falsity appeared in Adams's medical records, had the State obtained and reviewed the records. According to petitioner, constructive knowledge is sufficient to support a constitutional violation.[1]

---

[1]Petitioner did not argue in his state collateral proceedings that the State had constructive knowledge of the falsity of the evidence, and the claim is procedurally defaulted at this point.

The Court is not persuaded by these arguments, factually and legally.  Factually, it is entirely a construct of hindsight at this point for petitioner to argue that, had the State taken certain steps, it could have uncovered Adams's prior medical history.  Legally, petitioner cites no case law in support of his novel legal arguments, and the Court finds none.  The Supreme Court has not ruled that "constructive knowledge" of the falsity of testimony suffices for purposes of a constitutional violation, nor has it defined any parameters for what would constitute "constructive knowledge."  In this regard, petitioner fails to show that the state court's adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See Harrington*, 562 U.S. at 98–99.  Petitioner does not meet his burden of proof under 28 U.S.C. §§ 2254(d)(1) and (2), and federal habeas relief is unwarranted.[2]

### *Ineffective Assistance of Trial Counsel*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel.  U.S. CONST. amend. VI.  A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  To

---

However, the Court addresses the merits of the claim because it entitles petitioner to no relief.

[2]Because petitioner fails to meet his burden of proof under AEDPA regarding the State's knowing use of false testimony, it is unnecessary for the Court to address petitioner's second argument that the false testimony was material.

assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id*. at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness

does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled.  *Id.*

The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's limitations:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. (quotation omitted).

Petitioner contends that trial counsel was ineffective in the following particulars.

*Adams's mental health issues*

Petitioner contends that trial counsel was ineffective in failing to discover and present evidence that Adams had a history of reporting hallucinations and delusions.  Specifically, petitioner argues that trial counsel should have been ready to impeach Adams's denial that he had any auditory or visual hallucinations or did not remember things that did not really happen.

16

In rejecting petitioner's argument on collateral review, the state trial court made the following relevant findings of fact regarding "Failure to Discover and Present Adams Medical Records," which were expressly adopted by the Texas Court of Criminal Appeals in its published opinion denying habeas relief:[3]

> 31. [Trial counsel's] pre-trial investigation included a thorough review of the entire State's file, a review of the search warrant, a telephone discussion with Nathan Adams, a review of the letters written by Nathan Adams to [the prosecutor], direction for her investigator to talk with Nathan Adams'[s] parents, and a review of Adams'[s] criminal record.

> 32. [Trial counsel] testified on direct examination [at the hearing] regarding her assessment of Nathan Adams['s] mental health based on her pre-trial investigation:  'I read all his letters to [the prosecutor] and I had spoken to Nathan myself; and nothing there suggested that he had any kind of psychotic issues, so I didn't think – I just attributed it [bipolar diagnosis] to being a mood disorder.'  As a result she did not order an *instanter* subpoena for his jail medical records after Adams[] testified about his bipolar diagnosis.  On cross examination [trial counsel] further explained that there was nothing relayed by her investigator who had spoken with Adams'[s] parents that 'led . . . [her] to believe that Nathan Adams suffered from instances in which he heard his father's voice telling him to kill himself.'  She also testified that Nathan Adams sounded 'coherent' at trial.  The Court finds [trial counsel's] testimony and explanation to be credible.

*Ex parte Weinstein*, pp. 310–311 (record citations omitted).  The state trial court also made the following relevant conclusions of law regarding the alleged ineffective assistance of counsel:

---

[3]"Applicant also claimed that he was denied effective assistance of counsel, but the habeas judge's initial factual findings and conclusions of law determined that applicant had not proven that claim. We adopt those findings and summarily deny relief on that claim." *Ex parte Weinstein*, 421 S.W.3d at 659, n.1.

53.     The Court concludes that [trial counsel] conducted a constitutionally reasonable pre-trial investigation in accord with prevailing professional standards.   Her pre-trial investigation included an interview with Nathan Adams, a review of his letters to [the prosecutor], and an interview with his parents.   None of this investigation led her to the conclusion that Nathan Adams suffered in the past from episodes of [auditory] hallucinations in which he heard voices telling him to hurt himself.   That [trial counsel] was incorrect in her assessment does not demonstrate that her representation was ineffective.   Accordingly, the Court concludes Applicant's claim for relief fails to satisfy *Strickland*'s first prong.

54.     The Court concludes that [trial counsel's] failure to discover and present Nathan Adams medical records did not create a probability sufficient to undermine confidence in the result of trial given the significant impeachment evidence presented against him at trial and the highly corroborated nature of his testimony.   Accordingly, the Court concludes Applicant fails to satisfy *Strickland*'s second prong.

*Ex parte Weinstein*, p. 320 (citations omitted).

The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.  *See Bell v. Cone*, 535 U.S. 685, 702 (2002); *Strickland*, 466 U.S. 689.  Here, petitioner again focuses on the fact that medical records existed had trial counsel subpoenaed and reviewed them.   However, his emphasis on the evidence that may have been available in hindsight fails to address the governing inquiry – what evidence and information was available to counsel at the time, and what actions counsel took in light of that evidence and information.   Here, the trial court's findings showed that trial counsel had made a thorough review of the State's file, including the letters written by Adams to the prosecutor.   Trial counsel also personally interviewed Adams, and the defense investigator

interview Adams's parents.  Trial counsel testified that "nothing there suggested that [Adams] had any kind of psychotic issues, so I didn't think – I just attributed it [bipolar diagnosis] to being a mood disorder."  She also testified that there was nothing relayed by her investigator who had spoken with Adams's parents that led her to believe that Adams suffered from instances in which he heard his father's voice telling him to kill himself, and she stated that he appeared "coherent" at trial.  The trial court expressly found trial counsel's explanations and testimony credible, and that her investigations and representation were constitutionally sufficient and reasonably effective under *Strickland*.  As noted by the trial court, "That [trial counsel] was incorrect in her assessment [of Adams] does not demonstrate that her representation was ineffective."  Petitioner's disagreement with these findings and conclusions is insufficient to meet his burden of proof under the relitigation bar imposed by AEDPA.

The state court on collateral review rejected petitioner's claims of ineffective assistance and found that petitioner failed to meet his burden of proof under *Strickland*. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

*Manslaughter jury instruction*

Petitioner argues that trial counsel should have requested a jury instruction on the offense of manslaughter.

In rejecting petitioner's argument on collateral review, the state trial court made the following relevant findings of fact regarding "Manslaughter Instruction," which, as noted earlier, were expressly adopted by the Texas Court of Criminal Appeals in its published opinion denying habeas relief:

34.   [Trial counsel] explains in an affidavit, that she employed a three part strategy on behalf of Applicant.  First, she introduced evidence of his medical history to build reasonable doubt that he was physically capable of Murder.  Second, she introduced evidence of a prior robbery against Applicant and how it impacted him emotionally in odor to explain his behavior of trying to mask the smell of Glaspie's corpse. Third, she employed an 'all-or-nothing Strategy' as she had doubt that the state could prove the *mens rea* for Murder.  The Court finds [trial counsel's] affidavit to be credible and consistent with the trial record.

35.   [Trial counsel] credibly testified that her 'all-or-nothing' strategy was consistent with Applicant's lack of desire to go to prison and his insistence that he did not commit the crime, coupled with her belief, based upon her experience, that the State could convict Applicant of Manslaughter but had problems proving the *mens rea* of Murder.

36.   The Court finds as not credible Applicant's unsworn declaration indicating that he would have requested a Manslaughter instruction had [trial counsel] consulted with him about one. The Court makes this determination based on the following:

     a.   Applicant misrepresents that [trial counsel's] affidavit indicated the State 'would' convict him of Manslaughter; the affidavit said 'could.'

20

b.     Applicant's declaration is inconsistent with the credible testimony of [trial counsel] and [the prosecutor] who both indicated that Applicant heard a presentation of the State's case from [the prosecutor], including a representation of Nathan Adams['s] expected testimony, during a special pre-trial meeting to see if a plea bargain could be reached.   Applicant told [the prosecutor], 'You'll never be able to prove it' and Applicant was not convinced to plead.

c.     [Trial counsel's] credible testimony that Applicant did not want to go to prison:   'Steven was very clear throughout my whole representation that he did not want to do any time – not even on tampering.'

*Ex parte Weinstein*, pp. 311–313 (record citations omitted).  The state trial court also made

the following relevant conclusions of law regarding the alleged ineffective assistance of

counsel:

55.     The Court concludes that [trial counsel's] decision to pursue an 'all-or-nothing' strategy and not request a Manslaughter instruction was a valid trial strategy in accord with prevailing professional norms.  The Court also concludes that this strategy was in accord with Applicant's desire not to go to prison and [trial counsel's] assessment that the jury 'could' convict Applicant of Manslaughter.  Accordingly, Applicant fails to satisfy *Strickland*'s first prong.

56.     The Court concludes that even if [trial counsel] had requested a Manslaughter instruction, Applicant has failed to demonstrate with any evidence that there exists a 'reasonable probability' that the jury would have exercised its discretion and convicted Applicant of this lesser included charge.  Accordingly, the Court concludes Applicant has failed to satisfy *Strickland*'s second prong.

*Ex parte Weinstein*, pp. 321–322 (citations omitted).

21

A decision to forgo a charge on lesser included offenses is strategic in nature. Strategic choices made after reasonable investigation will seldom if ever be found wanting, as courts are reluctant to second-guess matters of trial strategy. *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008). Trial counsel in the instant case set forth rational and justified reasons for her decision not to pursue a manslaughter charge, a trial strategy that petitioner did not demonstrate to be unreasonable. Petitioner's disagreement with the state court's determinations does not constitute grounds for granting federal habeas relief, and is insufficient to meet his burden of proof under the relitigation bar imposed by AEDPA.

The state court on collateral review rejected petitioner's claims of ineffective assistance and found that petitioner failed to meet his burden of proof under *Strickland*. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

***Conclusion***

Respondent's motion for summary judgment (Docket Entry No. 18) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.  A certificate of appealability is DENIED.  Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on August 28, 2015.

Gray H. Miller
United States District Judge